Article V, section 8 of the California Constitution provides that the Governor may not grant a pardon or commutation to a twice-convicted felon without a recommendation of this court. Although the court has often been asked to make such recommendations, we have not before provided a comprehensive explanation of our understanding of the nature of our article V, section 8 function. The purpose of this minute order is to provide such an explanation.
Under the California Constitution, the power to grant clemency to a person convicted of crime is an executive power, and its exercise often, and permissibly, rests on extrajudicial considerations. The role of this court under article V, section 8, is not to express a substantive view on the merits of an application; the court takes no position on whether the Governor should, as an act of mercy or otherwise, extend clemency to a particular applicant. It is, rather, to perform a more traditional judicial function: to determine whether the applicant's claim has sufficient support that an act of executive clemency, should the Governor choose to grant it, would not represent an abuse of that power. In accord with this understanding of the court's role, we have revised the standard letter by which we convey our recommendations on these matters to the Governor. (See part III, infra .)
*130 I.
The power to grant clemency is among the executive powers enumerated in article V of the California Constitution. Section 8 of that article provides:
**770 "(a) Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring."
*898 The statutory application procedures for twice-convicted felons require that an application for pardon or commutation of sentence be made to the Governor, who then must transmit the application to the Board of Parole Hearings. ( Pen. Code, § 4802.) After an investigation, the Board of Parole Hearings transmits a written recommendation to the Governor. (Id. , § 4813.) If the recommendation is favorable, or if the Governor chooses to forward the application notwithstanding an unfavorable recommendation, the application is forwarded to this court for our consideration. (Id. , §§ 4850, 4851.) "If a majority of the justices recommend that clemency be granted, the Clerk/Executive Officer of the Supreme Court shall transmit the application ... to the Governor ...." (Id. , § 4852.)
By historical tradition, clemency is an executive power rooted in the royal prerogative to forgive crimes against the state. "Executive clemency," it has been observed, "exists to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law. ... [I]t has always been thought essential in popular governments, as well as in monarchies, to vest in some other authority than the courts power to ameliorate or avoid particular criminal judgments. It is a check entrusted to the executive for special cases." ( Ex parte Grossman (1925) 267 U.S. 87, 120-121, 45 S.Ct. 332, 69 L.Ed. 527.) The power of clemency may be exercised for a variety of reasons. One recognized function of the clemency power is the exercise of mercy-a value that has generally been thought to be peculiarly the province of the executive. (See Brown, Retrospective Forum: The Robert Alton Harris Execution: The Quality of Mercy (1992) 40 UCLA L.Rev. 327, 328 ["Mercy cannot be quantified or institutionalized. It is properly left to the conscience of the executive entitled to consider pleas and should not be bound by court decisions meant to do justice." (Fn. omitted.) ].)
Consistent with this legal tradition, both state and federal Constitutions generally confer on the executive the power to grant clemency on whatever grounds he or she deems appropriate. (See Ohio Adult Parole Authority v. Woodard (1998) 523 U.S. 272, 280-281, 118 S.Ct. 1244, 140 L.Ed.2d 387 (plur. opn.) [clemency is granted "as a matter of grace, thus allowing the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations."].) Indeed, "in most states, 'the only oversight of clemency rest[s] with voters who elect the Governors.' " (Moylan & Carter, Clemency in California Capital Cases (2009) 14 Berkeley J. of Crim. L. 37, 41, fn. 25.) In some states, the Governor shares this power to some degree with the Legislature or with an executive body. In a small number of states, the Governor shares this power with a multimember pardon board whose members include high court justices. (See *131 Minn. Const., art. V, § 7 ; Nev. Const., art. V, § 14.) The *899 California Constitution is unusual, however, in that it assigns to members of the judicial branch-sitting in their judicial capacity-a formal role in the clemency process.
The unique nature of California's constitutional provision raises the question whether, in exercising that role in the case of twice-convicted felons, the justices of this court are to make the same sort of substantive judgments the Governor is permitted to make in determining whether to grant clemency to a particular convict. That is to say, in order to make a favorable recommendation must we take the view, on the merits, that a particular convict should be shown mercy, or for some other reason granted clemency? Considering separation of powers principles, we conclude our proper role is more limited. Rather than assume some portion of the executive clemency function, the court's proper role is a traditional judicial one: to provide a check on **771 potential abuses of the power conferred on the executive.
The history of article V, section 8 supports this view. California's original 1849 Constitution conferred on the Governor the power to grant pardons except in cases of treason and impeachment, which were subject to the control of the Legislature. ( Cal. Const. of 1849, art. V, § 13 ; 1 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879, p. 7 (hereafter Debates).) In the 1878-1879 constitutional convention, the delegates considered several additional restrictions on the pardon power-including provisions requiring concurrence of the Chief Justice or Attorney General for pardons and commutations generally, allowing the Legislature to regulate the exercise of clemency, and imposing a complete bar on clemency for two- or three-time felons-before settling on the requirement that a majority of this court recommend clemency for twice-convicted felons. (See 1 Debates, pp. 354-357; 3 Debates, p. 1195.)
Delegates speaking in favor of such restrictions observed that Governors were frequently importuned for pardons and commutations by family and friends of those convicted, and that in some cases clemency was granted where it appeared to be undeserved. (1 Debates, pp. 274, 355-356.) "There may be exceptions to the rule, but generally pardons are granted through pressure brought to bear upon the Chief Executive by reason of great political influence or the influence of friends." (Id. , p. 358, col. 2 [remarks of Mr. Beerstecher].) In addition to personal or factional influence, and petitions based on misrepresentations of fact, the delegates feared the potential for outright corruption: "If we should be unfortunate enough at some future time to have a corrupt Governor, we might see the absolute necessity of taking the pardoning power out of his hands." (Id. , p. 356, col. 1 [remarks of Mr. Townsend].) Giving a role to the Chief Justice or another officer would "hold in check" the Governor. (Id. , p. 357, col. 1 [speech of Mr. Johnson].)
*900 The provision that was ultimately adopted originated with a delegate, Isaac S. Belcher, who earlier had served as an associate justice of this court. His amendment to a proposed clause absolutely barring clemency for twice-convicted felons provided instead that they could not be pardoned or their sentences commuted "[u]nless upon the written recommendation of a majority of the Judges of the Supreme Court." (3 Debates, p. 1195, col. 2.) His amendment would be effective, Mr. Belcher argued, "because a majority of the Supreme Court will never sign a paper recommending the Governor to pardon, in a particular instance, unless there be *132 something that clearly recommends him to the mercy of the Governor." (Ibid. )
The delegates considered objections that the Belcher amendment would involve the Supreme Court too deeply in the exercise of executive clemency, to which a supporting speaker observed that it "does not make the Supreme Court the pardoning power at all. It merely is a restriction upon the power of the Governor. When the Supreme Court have recommended the Governor to exercise the pardoning power, after an examination of the case, he still has to exercise his judgment." (3 Debates, p. 1196, col. 2 [remarks of Mr. Wilson].) The Belcher amendment was approved, and the executive clemency section ultimately adopted as article VII, section 1 of the new Constitution, and later moved to article V, section 8, substantively unchanged as relevant here. It provided in part: "Neither the Governor nor the Legislature shall have power to grant pardons, or commutations of sentence, in any case where the convict has been twice convicted of felony, unless upon the written recommendation of a majority of the Judges of the Supreme Court." (Id. , p. 1515; see id. , pp. 1197-1198.)
The convention debates reveal two essential points: First, the delegates' primary concern in adopting what is now article V, section 8, was to provide some check on the arbitrary use of the pardon power in the case of twice-convicted felons. But second, and critically, the debates contain no indication that the delegates intended for the justices of the court to supplement or supplant the Governor's executive clemency authority. They instead believed the court could serve as a check on the Governor within the confines of **772 its traditional judicial role, determining whether there exists a legitimate basis on which the Governor could choose to grant clemency to the applicant.
II.
We acknowledge that the court's practice has not always been consistent with this understanding. Indeed, in the only known case in which the justices provided a set of reasons for their recommendations, the majority took a different approach. ( In re Billings (1930) 210 Cal. 669, 298 P. 1071 ( Billings ).) The court's experience with that approach is, however, itself instructive.
*901 The Billings case concerned the 1930 pardon application of Warren K. Billings. Billings was a radical labor activist who, along with an accomplice, was charged and convicted of murder for a bombing in San Francisco that killed 10 people and injured scores more. Billings was sentenced in 1916 to life in prison. Because he had a previous felony conviction for transporting dynamite, his 1930 pardon application came before this court for a recommendation pursuant to what was then article VII, section 1, of the Constitution. Because of the intense public controversy regarding the case, the court undertook an extraordinary investigation-going so far as to hear live testimony and visit the applicant in state prison-and published statements explaining our denial of the recommendation (with a dissenting view). ( Billings , supra , 210 Cal. at pp. 670-672, 691, 298 P. 1071.)
The court's majority concluded Billings had not cast sufficient doubt on the validity of his conviction to justify a pardon recommendation. ( Billings , supra , 210 Cal. at p. 685, 298 P. 1071.) Nor had Billings demonstrated his innocence, a showing the majority believed he "was bound to tender ... as a basis for his application for a pardon." ( Ibid. ) But Justice Langdon, in a dissenting statement, argued that given the existence of doubt regarding the conviction the court should not "preclude the Governor from taking such action upon the *133 application as in his judgment he may deem proper." ( Billings , at p. 690, 298 P. 1071 (dis. opn. of Langdon, J.).) Expanding on this view, he argued the Constitution did not give the court the power to grant or withhold pardons: "That power rests with the Governor, and may be exercised by him for reasons of his own. Proof of innocence has never been an essential requirement for its exercise. It cannot be required as a condition to a recommendation which is itself not final. If we find that there has been a failure of proof of guilt, it is proper for us to make the recommendation on that ground. Our task is then ended. The Governor is then free to act as he may desire." ( Billings , at pp. 784-785, 298 P. 1071.)
The controversy surrounding the Billings case continued. In 1939, Billings again applied for clemency. This time, with our recommendation, Governor Cuthbert Olson commuted his sentence, and in 1961, Governor Edmund G. (Pat) Brown pardoned Billings. So far as the record reveals, the court has never again undertaken an extraordinary investigation of the sort it undertook in the early rounds of the Billings case to evaluate the applicant's claim of innocence. Subsequent history is consistent with a recognition that an intensive examination of the merits of a clemency petition exceeds this court's proper role in our system of separated powers. That was the position taken by Justice Langdon's dissent, which we believe captures the better view of the nature of this court's article V, section 8 function: The clemency power "rests with the Governor, and may be exercised by him for reasons of his own" ( Billings , supra , 210 Cal. at p. 784, 298 P. 1071 (dis. opn. of Langdon, J.) ); the court's only role is to ensure that the application has sufficient support that the exercise of the power would not be improper.
*902 III.
From our general understanding of separation of powers principles and from the history discussed above, we conclude article V, section 8 of the California Constitution does not require the justices of this court to determine whether, in the view of each justice, an applicant deserves clemency, whether based on claimed innocence of the crime, rehabilitation, mercy, or other grounds. We instead interpret it as calling for a more conventionally judicial judgment: Does the **773 claim have sufficient support that an act of executive clemency, should the Governor decide to grant it, would not represent an abuse of that power? The recommendation called for by article V, section 8, in other words, is not a recommendation that the Governor grant the application; it is merely an acknowledgment that the Governor may legitimately consider granting the application in the exercise of the power conferred on him by article V.
In light of the conclusions expressed above, the court has altered the wording of the letters by which we convey to the Governor our recommendation regarding pardon or commutation applications from twice-convicted felons. It has been our practice to announce our decision in these matters by sending the Governor a letter that read: "The justices of the Supreme Court of California have considered the above application for [a pardon] [commutation] and a majority of the justices recommend that the application [not] be granted." The standard letter will now read: "On the application of [name] for [pardon] [commutation of sentence], the court, with at least 4 judges concurring, hereby [makes] [declines to make] the recommendation required by article V, section 8 of the California Constitution for the Governor *134 to grant a [pardon] [commutation of sentence]."
/s/ Cantil-Sakauye
Chief Justice
/s/ Chin
Associate Justice
/s/ Corrigan
Associate Justice
/s/ Liu
Associate Justice
/s/ Cuéllar
Associate Justice
/s/ Kruger
Associate Justice